UNITED STATES DISTRICT COURT
Northern District of Indiana
Fort Wayne Division

WESTFIELD NATIONAL
 INSURANCE COMPANY

      Plaintiff

v.

TIPPMANN PROPERTIES, INC.
9009 Coldwater Road
Fort Wayne, IN 46825

And

AIG SPECIALTY INSURANCE
COMPANY
c/o Indiana Department of Insurance
311 West Washington Street
Suite 300
Indianapolis, IN 46204

And

LIBERTY MUTUAL FIRE
INSURANCE COMPANY A/S/O
DIETZ & WATSON, INC.
 c/o Corporation Service Co.
251 East Ohio Street
Suite 500
Indianapolis, IN 46204

And

TRAVELERS INDEMNITY COMPANY
OF AMERICA A/S/O MILK INDUSTRY
MANAGEMENT CORP. AND DAIRY
FARMERS OF AMERICA, INC.
c/o Corporation Service Co.
251 East Ohio Street
Suite 500
Indianapolis, IN 46204

And

Case No.: _____

1

TRAVELERS CASUALTY INSURANCE
COMPANY OF AMERICA A/S/O
F.C. GEISHEIMER JR., INC.
c/o Corporation Service Co.
251 East Ohio Street
Suite 500
Indianapolis, IN 46204

And

HARLEYSVILLE PREFERRED INSURANCE
CO. A/S/O HOME FOOD SERVICES OF
PENNSYLVANIA
 c/o National Registered Agents, Inc.
150 West Market Street
Suite 800
Indianapolis, IN 46204

And

BLACK BEAR DISTRIBUTION, LLC.
5701 Tacony Street
Philadelphia, PA 19135

       Defendants

## COMPLAINT FOR DECLARATORY JUDGMENT

The Plaintiff, Westfield National Insurance Company ("Westfield"), by counsel, and for its Complaint for Declaratory Judgment, now states as follows:

### I.     JURISDICTION AND PARTIES

1.     Westfield is an insurance company incorporated under the laws of the State of Ohio with its principal place of business in the State of Ohio, and which transacts business within the State of Indiana.

2.     Defendant Tippmann Properties, Inc. ("Tippmann"), is an Indiana corporation with its principal place of business in Allen County, Indiana.

3.      Defendant AIG Specialty Insurance Company ("AIG"), is an insurance company incorporated under the laws of the State of Illinois with its principal place of business in the State of New York.

4.      Defendant Liberty Mutual Fire Insurance Company ("Liberty Mutual"), is an insurance company incorporated under the laws of the State of Wisconsin with its principal place of business in the State of Massachusetts.

5.      Defendant Travelers Indemnity Company ("Travelers Indemnity"), is an insurance company incorporated under the laws of the State of Connecticut with its principal place of business in the State of Connecticut.

6.      Defendant Travelers Casualty Insurance Company ("Travelers Casualty"), is an insurance company incorporated under the laws of the State of Connecticut with its principal place of business in the State of Connecticut.

7.      Defendant Harleysville Preferred Insurance Company ("Harleysville"), is an insurance company incorporated under the laws of the State of Pennsylvania with its principal place of business in the State of Pennsylvania.

8.      Defendant Black Bear Distribution, LLC ("Black Bear"), is a New Jersey limited liability company with its principal place of business in the State of Pennsylvania.

9.      Jurisdiction is proper in this court, pursuant to 28 U.S.C. § 1332(d), due to the diversity in citizenship of the parties and the fact that the amount in controversy exceeds the sum of $75,000.

10.     Venue is proper in the Fort Wayne division of this court, pursuant to 28 U.S.C. § 1391, due to the fact that the insurance contract at issue was issued in Fort Wayne, Indiana to cover an insured with a primary place of business in Fort Wayne, Indiana.

## II.     THE LOSS AND THE UNDERLYING LAWSUITS

11.     On September 1, 2013, a fire occurred in a cold storage warehouse located at 1000 Coopertown Road, Delanco, New Jersey ("the warehouse").

12.     The fire in question is believed to have started on the roof of the warehouse.

13.     At all pertinent times, the warehouse was owned, operated and/or utilized by Dietz & Watson, Inc. ("Dietz & Watson"), Black Bear Distribution ("Black Bear"), LLC and Village Properties Urban Renewal, LLC ("Village Properties").

14.     At the time of the fire, Dietz & Watson had an insurance policy through AIG which covered the warehouse.

15.     AIG reportedly made payments to and/or on behalf of Dietz & Watson and/or its related entities, for damages arising out of the fire.

16.     In its capacity as subrogee of Dietz & Watson and its related entities, AIG has filed suit against a number of entities and individuals, one of which is Tippmann Construction, Inc., who at various times had reportedly performed and/or been involved with work on the roof of the warehouse.

17.     AIG's lawsuit is pending in the Superior Court of New Jersey, Burlington County Division, docket number BUR-L-00285-15.  A true and accurate copy of AIG's Complaint is attached hereto as **Exhibit A**.

18.     At the time of the fire, Dietz & Watson also had an insurance policy through Liberty Mutual which covered the warehouse.

19.     Liberty Mutual reportedly made payments to and/or on behalf of Dietz & Watson and/or its related entities, for damages arising out of the fire.

4

20.     In its capacity as subrogee of Dietz & Watson and its related entities, Liberty Mutual has filed suit against a number of entities and individuals, one of which is Tippmann Construction, Inc., who at various times had reportedly performed and/or been involved with work on the roof of the warehouse.

21.     Liberty Mutual's lawsuit is pending in the Superior Court of New Jersey, Burlington County Division, docket number BUR-L-1782-14.   A true and accurate copy of Liberty Mutual's Amended Complaint is attached hereto as **Exhibit B**.

22.     At the time of the fire, food goods belonging to Milk Industry Management Corporation ("MIM") and Dairy Farmers of America, Inc. ("Dairy Farmers") reportedly were being stored in the warehouse.

23.     MIM's and Dairy Farmers' food goods were insured under policies issued to them by Travelers Indemnity.

24.     Travelers Indemnity reportedly made payments to and/or on behalf of MIM and Dairy Farmers for the loss of their food items.

25.     In its capacity as subrogee of MIM and Dairy Farmers, Travelers Indemnity has filed suit against a number of entities and individuals, one of which is Tippmann Construction, Inc., who at various times had reportedly performed and/or been involved with work on the roof of the warehouse.

26.     At the time of the fire, food goods belonging to F.C. Geisheimer, Jr., Inc. ("Geisheimer") reportedly were being stored in the warehouse.

27.     Geisheimer's food goods were insured under policies issued to it by Travelers Casualty.

28.     Travelers Casualty reportedly made payments to and/or on behalf of Geisheimer for the loss of its food items.

29.     In its capacity as subrogee of Geisheimer, Travelers Casualty has filed suit against a number of entities and individuals, one of which is Tippmann Construction, Inc., who at various times had reportedly performed and/or been involved with work on the roof of the warehouse.

30.     At the time of the fire, food goods belonging to Home Food Services of Pennsylvania ("Home Food Services") reportedly were being stored in the warehouse.

31.     Home Food Services' food goods were insured under policies issued to them by Harleysville.

32.     Harleysville reportedly made payments to and/or on behalf of Home Food Services for the loss of its food items.

33.     In its capacity as subrogee of Home Food Services, Harleysville has filed suit against a number of entities and individuals, one of which is Tippmann Construction, Inc., who at various times had performed and/or been involved with work on the roof of the warehouse.

34.     Travelers Indemnity's, Travelers Casualty's and Harleysville's lawsuit is pending in the Superior Court of New Jersey, Burlington County Division, docket number BUR-L-2297-14.  A true and accurate copy of the Complaint filed by Travelers Indemnity, Travelers Casualty and Harleysville is attached hereto as **Exhibit C**.

35.     AIG, Liberty Mutual, Travelers Indemnity, Travelers Casualty and Harleysville all seek monetary damages from the various entities and individuals who had reportedly performed and/or been involved with work on the roof of the warehouse, including Tippmann

Construction, Inc., and seek to hold the various defendants jointly and severally liable for their alleged damages.

36.     Tippmann tendered the defense of AIG's, Liberty Mutual's, Travelers Indemnity's, Travelers Casualty's and Harleysville's claims and lawsuits (collectively, "the subrogation actions") to Westfield.

37.     At the time of the fire, Black Bear was the operator of the warehouse.

38.     At the time of the fire, goods belonging to Wakefern Food Corporation ("Wakefern") were also reportedly present at the warehouse.

39.     Lexington Insurance Company ("Lexington") insured Wakefern and made payments to and/or on behalf of Wakefern for the loss of its goods.

40.     In its capacity as subrogee of Wakefern, Lexington sued Black Bear for monetary damages, which lawsuit is pending in the Superior Court of New Jersey, Burlington County Division, docket number BUR-L-2201-14.

41.     Lexington did not name Tippmann Construction, Inc. as a defendant in its lawsuit.

42.     Black Bear filed a Third-Party Complaint against the various entities and individuals, including Tippmann Construction, Inc., who had reportedly performed and/or been involved with work on the roof of the warehouse.  A true and accurate copy of Black Bear's Third-Party Complaint is attached hereto as **Exhibit D**.

43.     Black Bear's Third-Party Complaint seeks indemnity and contribution from the various Third-Party Defendants, including Tippmann Construction, Inc..

44.     Tippmann tendered the defense of Black Bear's claims and Third-Party Complaint to Westfield.

### III.    THE CLAIMS AGAINST TIPPMANN

45.    Prior to the fire, two separate projects were performed on the warehouse – the modification of the warehouse from dry storage to cold storage, in approximately 2006, and the installation of a photovoltaic system, in approximately 2010.  (See, generally, Exh.A, para. 16-27; Exh. B, para. 16-27; Exh. C, para. 20-31; Exh. D, para. 16-27).

46.    No allegations were made against Tippmann in any of the subrogation Complaints or Black Bear's Third-Party Complaint with respect to the 2010 work or the photovoltaic system.

47.    Dietz & Watson hired Tippmann for the 2006 modification project, and the terms of their contractual arrangement were set forth in a Design/Build Agreement.  (Exh.A, para. 16; Exh. B, para. 16; Exh. C, para. 20; Exh. D, para. 16). A true and accurate copy of the Design/Build Agreement is attached hereto as **Exhibit E**.

48.    Black Bear was not a party to the Design/Build Agreement, and is not referenced therein; the parties to the Agreement were Tippmann, Dietz & Watson and Village Properties. (Exh. E, generally).

49.    Tippmann's work on the warehouse renovation project was completed in June of 2007.  (Exh.A, para. 19; Exh. B, para. 19; Exh. C, para. 23; Exh. D, para. 19).

50.    The Complaints in the subrogation actions and Black Bear's Third-Party Complaint allege that Tippmann was "the designer and installer of the roof assembly over the new freezer section of the warehouse in 2006."  (Exh.A, para. 10; Exh. B, para. 10; Exh. C, para. 14; Exh. D, para. 10).

51.    The Complaints and Third-Party Complaint further allege that Tippmann designed a freezer roof section "which included two (2) layers of Extruded Polystyrene (hereafter "XPS") insulation, seven (7) inches thick, above the existing roof, covered with

Firestone .060 UltraPly TPO membrane."  (Exh.A, para. 17; Exh. B, para. 17; Exh. C, para. 21; Exh. D, para. 17).

52.     The Complaints and Third-Party Complaint further allege that the roof design did not include coverboard between the insulation and the roof membrane.  (Exh.A, para. 18; Exh. B, para. 18; Exh. C, para. 22; Exh. D, para. 18).

53.     The Complaints and Third-Party Complaint further allege that installation of the roof assembly as designed "created a significant risk of fire spread through the roof and into the warehouse."  (Exh.A, para. 33; Exh. B, para. 33; Exh. C, para. 36; Exh. D, para. 33).

54.     The Complaints each allege negligence on the part of Tippmann.  (Exh.A, Count XVIII; Exh. B, Count XVIII; Exh. C, Count XVI).

55.     AIG, Liberty Mutual, Travelers Indemnity, Travelers Casualty and Harleysville and Black Bear each allege in their Complaints that Tippmann Construction, Inc. "knew or should have known" that using XPS insulation in the roof assembly plans "created an unreasonable risk of fire spread through the roof and into the warehouse."  (Exh.A, para. 122; Exh. B, para. 106; Exh. C, para. 137).

56.     AIG, Liberty Mutual, Travelers Indemnity, Travelers Casualty and Harleysville each further allege in their Complaints and Third-Party Complaint that Tippmann Construction, Inc. breached its duty of care by:

        a.      designing and installing a roof assembly which incorporated XPS insulation in the roof plans;

        b.      designing and installing a roof assembly which did not incorporate a coverboard;

   c.      designing and installing a roof assembly which created an "unreasonable risk of fire spread through the roof and into the warehouse";

   d.      failing to warn of the risk of fire spread;

   e.      "[f]ailing to provide appropriate advice, guidance and direction concerning the safe design, construction and installation of a roof assembly on the warehouse"; and

   f.      not properly assessing the risks and hazards associated with the incorporation of the XPS insulation.

(Exh.A, para. 123; Exh. B, para. 107; Exh. C, para. 138).

57.    Travelers Indemnity, Travelers Casualty and Harleysville also alleged that Tippmann was negligent by failing to follow applicable building codes.  (Exh. C, para. 138).

58.    One of the other defendants named in each of the various Complaints and the Third-Party Complaint is Steven Tiberio, I.A.I. ("Tiberio").  (Exh.A, Count XXII; Exh. B, Count XXII; Exh. C, Count XX; Exh. D, para. 14).

59.    Tiberio is an engineer and/or architect who was involved in the 2006 roof installation with which Tippmann was involved.  (Exh.A, Count XXII; Exh. B, Count XXII; Exh. C, Count XX; Exh. D, para. 14).

60.    AIG, Liberty Mutual, Travelers Indemnity, Travelers Casualty and Harleysville each allege in their Complaints that Tiberio improperly approved the plans for the 2006 warehouse renovation project and, in particular, that he:

   a.      approved plans "which created an unreasonable risk of fire";

   b.      failed to warn of the fire risk;

c.      failed to assess the risks and hazards associated with the use of XPS insulation;

d.      failed to assess the risks and hazards associated with the lack of a coverboard; and

e.      failed to comply with applicable building codes.

(Exh.A, para. 148; Exh. B, para. 127 ; Exh. C, para. 162).

61.     Black Bear generally alleges that the various Third-Party Defendants involved in the roof projects, including Tippmann Construction, Inc. and Tiberio, were negligent for reasons to similar to those set forth by AIG, Liberty Mutual, Travelers Indemnity, Travelers Casualty and Harleysville in their Complaints.  (Exh. D., para. 33-37, 40).

62.     Upon receiving the tender of the Complaints and Third-Party Complaint, Westfield conducted an investigation and determined that Tippmann hired Tiberio, in his capacity as an engineer and/or architect, to conduct research into whether the construction plans satisfied applicable building codes.

63.     Tippmann also hired Tiberio, in his capacity as an engineer and/or architect, to review and approve the plans for the 2006 work, including, specifically, to review the plans for the roof assembly at issue.

64.     At Tippmann's request, Tiberio reviewed and approved the plans for the roof assembly, which included the Extruded Polystyrene insulation and the lack of a coverboard.

## IV.     INSURANCE POLICY

65.     At all pertinent times, Tippmann had an insurance contract with Westfield, policy number TRA 7376379.  A true and accurate copy of the insurance contract is attached hereto as **Exhibit F**.

11

66.     Tippmann Construction, Inc. was listed on the Policy Named Insured endorsement, and is thus a named insured under the insurance policy.

67.     The policy included a Commercial General Liability ("CGL") policy, and its main coverage form (form CG 00 01 12 07) contained the following pertinent provisions:

SECTION I – COVERAGES[1]

COVERAGE A     BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1.     Insuring Agreement

   a.     We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for . . . "property damage" to which this insurance does not apply. . . .

.     .     .

2.     Exclusions

This insurance does not apply to:

.     .     .

   l.     Damage To Your Work

   "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

   This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

.     .     .

_____

[1]     Boldfaced type has been removed from all policy language herein for ease of reading.

SUPPLEMENTARY PAYMENTS – COVERAGES A AND B

.   .   .

2.  If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

    a.  The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

    b.  This insurance applies to such liability assumed by the insured;

    c.  The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

.   .   .

SECTION V -- DEFINITIONS

.   .   .

16.  "Products-completed operations hazard":

    a.  Includes all . . . "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

.   .   .

    (2)  Work that has not yet been completed or abandoned.  However, "your work" will be deemed completed at the earliest of the following times:

        (a)  When all of the work called for in your contract has been completed.

.   .   .

    Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

13

.   .   .

22. "Your work":

    a.    Means:

        (1)    Work or operations performed by you or on your behalf; and

        (2)    Materials, parts or equipment furnished in connection with such work or operations.

    b.    Includes:

        (1)    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work;" and

        (2)    The providing of or failure to provide warnings or instructions.

.   .   .

68. A Contractors General Liability Expanded Plus Endorsement (form CG 70 94 08 05) was also made a part of the policy.  It contained the following pertinent provisions:

    1.    SECTION I – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY is amended as follows:

.   .   .

    Item 2. Exclusions l. is deleted and replaced with the following:

    l.    Damage To Your Work

        "Property damage" to "your work" arising out of it and included in the "products-completed operations hazard".

        This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

        This exclusion only applies to that particular part of "your work" out of which the damage arises.

69. The CGL policy was also modified by a Contractors – Professional Liability exclusion (form CG 22 79 07 98) which provided:

> The following exclusion is added to Paragraph 2., Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability . . .
>
> 1. This insurance does not apply to . . . "property damage" . . . arising out of the rendering of or failure to render any professional services by you or on your behalf, but only with respect to either or both of the following operations:
>
>    a. Providing engineering, architectural or surveying services to others in your capacity as an engineer, architect or surveyor; and
>
>    b. Providing, or hiring independent professionals to provide, engineering, architectural or surveying services in connection with construction work you perform.
>
> 2. Subject to Paragraph 3. Below, professional services include:
>
>    a. Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and
>
>    b. Supervisory or inspection activities performed as part of any related architectural or engineering activities.
>
> 3. Professional services do not include services within construction means, methods, techniques, sequences and procedures employed by you in connection with your operations in your capacity as a construction contractor.

70. At all pertinent times, Tippmann's insurance contract also included a commercial umbrella policy (form CU 00 01 12 07).  It contained the following material provisions:

> SECTION I – COVERAGES
>
> COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY
>
> 1. Insuring Agreement

a. We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of . . . "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking damages for such . . . "property damage" when the "underlying insurance" does not provide coverage or the limits of the "underlying insurance" have been exhausted.  When we have no duty to defend, we will have the right to defend, or to participate in the defense of, the insured against any other "suit" seeking damages to which this insurance may apply.  However, we will have no duty to defend the insured against any "suit" seeking damages for . . . "property damage" to which this insurance does not apply. . . .

. . .

2. Exclusions

This insurance does not apply to:

. . .

o. Damage To Your Work

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a sub-contractor.

. . .

s. Professional Services

"Bodily injury" or "property damage" due to rendering or failure to render any professional service.  This includes but is not limited to:

. . .

(2) Preparing, approving, or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and

specifications by any architect, engineer or surveyor performing services on a project on which you serve as construction manager;

(3)    Inspection, supervision, quality control, architectural or engineering activities done by or for you on a project on which you serve as construction manager;

(4)    Engineering services, including related supervisory or inspection services;

.   .   .

SUPPLEMENTARY PAYMENTS – COVERAGES A AND B

.   .   .

3.    If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

a.    The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

b.    This insurance applies to such liability assumed by the insured;

c.    The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

.   .   .

SECTION V – DEFINITIONS

.   .   .

17.    "Products-completed operations hazard":

a.    Includes all . . . "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

.   .   .

17

(2)    Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

    (a)    When all of the work called for in your contract has been completed.

.   .   .

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

.   .   .

28.    "Your work":

a.    Means:

(1)    Work or operations performed by you or on your behalf; and

(2)    Materials, parts or equipment furnished in connection with such work or operations.

b.    Includes:

(1)    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work;" and

(2)    The providing of or failure to provide warnings or instructions.

.   .   .

71.    Black Bear is not listed on either the CGL or the umbrella policy as a named insured or an additional insured.

72.    Black Bear does not qualify as an "insured" under the Who Is An Insured portion of the CGL or umbrella policies.

73.     Although the CGL was modified by an endorsement making an owner of property an additional insured if such was required by a construction contract between the parties, Black Bear was not a party to the Design/Build Agreement.

74.     There was no contract between Tippmann and Black Bear under which Tippmann agreed to defend, indemnify or hold harmless Black Bear.

75.     As Black Bear is not an insured, a named insured or an additional insured under the CGL or the umbrella policy, and Black Bear is not Tippmann's contractual indemnitee, Black Bear does not qualify as an insured under Tippmann's CGL or umbrella policy for Black Bear.

76.     Westfield has no obligation to defend or indemnify Black Bear against Lexington's claims and lawsuit.

77.     There is no coverage under Tippmann's policies for Black Bear's indemnity or contribution claims against Tippmann.

78.     Tippmann's work on the warehouse was completed prior to the time any property damage to the warehouse or its contents occurred.

79.     All property damage to the warehouse and its contents occurred away from premises owned or rented by Tippmann.

80.     Because the work was completed and the property damage occurred away from premises owned or rented by Tippmann, any property damage arising out of Tippmann's "work" was part of the "products-completed operations hazard."

81.     There is no coverage under either the CGL or the Commercial Umbrella policies for any damage to the work or operations performed by Tippmann's employees, which would constitute "your work" as defined by the policy, pursuant to the "Damage To Your Work" exclusion contained in each of the policies.

82.     The Contractors – Professional Liability exclusion precludes coverage under the CGL policy for any property damage resulting from the rendering of professional services.

83.     Preparing and approving drawings, plans and blueprints constitute "professional services" as that term is defined in paragraph 2.a. of the Contractors – Professional Liability exclusion which is incorporated into the CGL policy.

84.     Paragraph 1.b. of the exclusion precludes coverage for property damage arising out of the performance of professional services by an independent professional hired by the insured to provide engineering or architectural services in connection with the insured's construction work.

85.     Tiberio is an independent professional.

86.     Tiberio was hired by Tippmann to provide engineering or architectural services in connection with Tippmann's construction work on the warehouse.

87.     There is no coverage under the CGL for any property damage arising out of Tiberio's rendering of or failure to render professional services.

88.     Tiberio's actions also constitute a "professional service" as that term is defined in the umbrella policy, under paragraphs (2), (3) and/or (4) of the Professional Services exclusion.

89.     There is no coverage under the umbrella policy for any property damage arising out of Tiberio's rendering of or failure to render professional services.

90.     There is no coverage under either the CGL or the umbrella policy for any property damage falling within the "professional service" exclusionary language.

91.     Tippmann seeks coverage and a defense against the various subrogation Complaints and Black Bear's Third-Party Complaint pursuant to the Commercial General Liability policy and/or Commercial Umbrella Policy.

92.     AIG, Liberty Mutual, Travelers Indemnity, Travelers Casualty, Harleysville and Black Bear are named herein as parties as they are all seeking to recover from Tippmann, and have an interest in whether there is coverage under the Westfield policies for the damages they seek.

93.     Westfield is presently defending Tippmann against the various Complaints and Third-Party Complaint pursuant to a reservation of rights.

94.     A real and actual controversy exists between the parties, and questions have arisen regarding coverage issues which ought to be decided by this Honorable Court in order to safeguard the rights of the parties hereto.

95.     Westfield has a substantial present interest in the relief sought.

WHEREFORE, Westfield National Insurance Company respectfully seeks an Order from this Honorable Court:

1.     Declaring that Westfield has no duty to defend Black Bear Distribution, LLC against Lexington Insurance Company's claims, or any claims which were raised or could have been raised by Lexington Insurance Company a/s/o Wakefern Food Corporation against Black Bear Distribution, LLC in the currently-pending lawsuit, case no. BUR-L-2201-14.

2.     Declaring that the Westfield policies do not provide coverage for Black Bear's indemnity and contribution claims against Tippmann, as set forth in the currently-pending lawsuit, case no. BUR-L-2201-14.

3.     Declaring that the Westfield policies do not provide coverage for any claims in any of the subrogation Complaints or Third-Party Complaint which fall within the scope of any of the applicable policy exclusions;

4.      Setting forth the relative rights and obligations of the parties with respect to coverage and defense with respect to the four underlying lawsuits brought against Tippmann; and

5.      Awarding all other just and proper relief.

Respectfully submitted,

WATERS, TYLER,
HOFMANN & SCOTT, LLC


By: s/ Tricia Hofmann_____
      Scott L. Tyler, Atty. #16218-10
      Tricia Kirkby Hofmann, Atty.#20480-46 A


WATERS, TYLER,
HOFMANN & SCOTT, LLC
1947 East Spring Street
New Albany, IN 47150
(812) 949-1114